# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL CARPENTER,  :  Civ. No. 16-cv-02327
    Petitioner  :

v.  :  **FILED**
      :  **SCRANTON**

J. BALTAZAR,  :  JUN 2 7 2017
WARDEN, USP CANAAN,  :
    Respondent  :  PER _____ DEPUTY CLERK

## PETITIONER'S BRIEF IN SUPPORT OF HIS
## MOTION FOR RECONSIDERATION

This brief is filed in support of Petitioner's Motion for

Reconsideration (Doc. #17) and in opposition to the Respondent's

Opposition brief (Doc. #18) (hereinafter "Gov. Br.").

The gist of the government's opposition brief is that I am not

entitled to the extraordinary relief provided by Rule 60(b) and that if

the Court were to grant my Motion to Amend my Petition (See Doc. #13)

asking for monetary damages of $10,000 per day for each day from

October 10, 2016 (when I should have been placed in Home

Confinement) to January 26, 2017 (when I was actually released), that I

should be made to pay the filing fee of $350. (See Gov. Br. at 5).

The problem with the government's facile argument is that it concedes that the Court has both the power to grant my Motion for Reconsideration (Doc. #17) and my Motion to Amend (Doc. #13). Therefore, based on the government's own admissions, I would respectfully ask that the Court grant my Motion for Reconsideration and convert this case to a civil rights action and I will pay the $350 fee into the Court.

Alternatively, the Court can recognize that I did ask for legal fees as well as declaratory relief in my earlier filings. See Gov. Br. at 3. Obviously, the government forgot that I did ask for legal fees in my initial Petition (Doc. #1) and I did ask for $10,000 a day for unlawful confinement in my Motion to Amend (See Doc. #13).

But in Doc. #3, I also did a Motion for an Order to Show Cause and for Injunctive Relief. Judge Kosik granted the Order to Show Cause on November 30, 2016. (See Doc. #8). However, due to Judge Kosik taking ill, he never ruled on my Injunctive Relief asked for in Doc. #3 or in the Memorandum of Law. (See Doc. #4). Significantly on page 4 of Doc. #3, I asked for an injunction, a TRO, all costs incurred in this action, and "For such other and further relief as the Court deems

proper." In my Memorandum of Law (Doc. #4 pages 15-17) I, in fact, point out that a ruling in my favor would not hurt the BOP in any way and would help the public policy of getting more non-violent "White-Collar" prisoners placed directly in Home Confinement to allow the people who really need Halfway Houses (e.g. homeless drug offenders) to get the help they need. See the Office of Inspector General Report issued November 2016 criticizing the Bureau of Prisons on this very point. Therefore it is clear that I asked not only for legal fees and costs of this action, but also for the highest form of declaratory judgment there is, which is "injunctive" relief. (See Doc. #3 page 4 and Doc #4 pages 16-17).

Moreover, when I filed my reply brief on January 5, 2017 (See Doc. #11) both the Warden and I knew that I was literally "three weeks to the door" and on page 11, I asked for a judgment in my favor to help other inmates in my situation and I attached as Exhibit Five to that filing the OIG Report criticizing the BOP for not putting more people in Direct Placement Home Confinement.

Not only does Doc. #11 go into great detail how the BOP ignored its own rules and regulations in my case, if this Court does **not** grant

my Motion for Reconsideration, then the BOP will do to every inmate

what it did to me: delay the administrative proceedings with bogus

replies and rejections and then drag their feet with the 2241 process

until they can file their Suggestion of Mootness.  Just to remind the

Court, I should have been eligible for Halfway House in February 2016.

My Home Confinement Date was October 10, 2016.  I began the BP-8

and BP-9 "administrative" process in June of 2016.  My 2241 was filed

in November and unfortunately – after granting an Order to Show

Cause on November 30, 2016 – Judge Kosik became ill and was

replaced by Your Honor.  None of this is my fault and I have been a

model "diligent" petitioner as discussed in *Burkett v. Cunningham,* 826

F. 2d 1208 (3d Cir. 1987).  So at the very least I am entitled to a

judgment in my favor for at least $2,500 for the costs of this action if not

the $10,000 per day of my Amended Petition. (See Doc. #13).

Finally I wish to point to the Exhibits attached to my Traverse –

Doc #11 of my Reply Brief where in addition to the OIG report I

attached as Exhibit Five, there is also a letter from Blake Davis of the

BOP dated May 24, 2013 attached as Exhibit Three and PS 7320.01

updated August 2016 attached as Exhibit Four.  I mention these three

Exhibits so that the Court can issue a Declaratory Judgment in my

favor – with or without a monetary judgment – stating in the public

interest that 18 USC 3624(c) requires that all inmates receive at least

12 months of Halfway House and Home Confinement  pursuant to the

Second Chance Act.  This decision by the Court should underscore the

government's own citation to *Yannucci v. Stansberry*, No. 2:09 CV-561,

2009 WL 2421546 (E.D. Va. 2009) in its earlier response to Judge

Kosik's Order to Show Cause (see Doc. #10 at 15).

     The *Yannucci* case is instructive for several reasons because it

discusses the factors the BOP should have used in my case pursuant to

18 U.S.C. § 3621(b) and because the staff at Petersburg recommended

him for one year of Direct Placement Home Confinement.  Yannucci did

a 2241 Petition because the BOP only granted him six months of Home

Confinement.  In my case, I received zero months of Home Confinement

and zero months of Halfway House, despite the clear dictates of § 3624

and the BOP's own rules and regulations.  The BOP did not even give

me one or two weeks off after I filed my reply Brief on January 5, 2017.

That is why on page 11 of my Reply Brief I asked for this Court to rule

in my favor so that "this Court will use my 2241 Petition to help other

non-violent inmates get Direct Placement to Home Confinement or the Halfway House time they are entitled to under the Second Chance Act and Sections 3621 and 3624 and as recommended by the OIG's most recent review of the BOP's practices under the Second Chance Act." Contrary to the Respondent's Suggestion of Mootness, there is nothing "moot" as to any of the motions and they are clearly in the public's interest to change the way that the Second Chance Act is ignored by the Warden at Canaan and by certain other prisons across the country. I asked this Court for injunctive relief, fees and costs as well as my liberty, and I also asked this Court for any other relief this "Court deems proper" including $10,000 for each day that I was held at Canaan because the Warden chose to ignore the clear directives of Section 3624 and the Second Chance Act as well as the OIG's November 2016 Report which I attached again for the Court's reference. Once again, there is nothing "moot" about Warden Baltazar's failure to obey the laws of the United States and the rules and regulations of the BOP.

## **CONCLUSION**

For the reasons stated above, I respectfully request that this Court grant my Motion to Reconsider and to allow me to pursue my claims against the Respondent and for the Court to grant any other relief that it deems proper in this case.

Daniel Carpenter
Petitioner, *pro se*
18 Pondside Lane
West Simsbury, CT 06092
June 16, 2017



Office of the Inspector General
U.S. Department of Justice

# Audit of the
# Federal Bureau of Prisons'
# Management of Inmate Placements
# in Residential Reentry Centers
# and Home Confinement

# AUDIT OF THE FEDERAL BUREAU OF PRISONS' MANAGEMENT OF INMATE PLACEMENTS IN RESIDENTIAL REENTRY CENTERS AND HOME CONFINEMENT

## EXECUTIVE SUMMARY

The Federal Bureau of Prisons (BOP) provides a variety of reentry programming to help incarcerated inmates successfully transition back into society. As part of its release preparation, BOP has the authority to place inmates in residential reentry centers (RRC), also known as halfway houses, and/or home confinement while serving the remainder of their sentences. BOP may determine that an inmate should not be placed into either an RRC or home confinement because, for example, the inmate poses a significant threat to the community. An inmate placed in an RRC and/or home confinement remains in BOP custody.

RRCs provide a supervised environment that support inmates in finding employment and housing, completing necessary programming such as drug abuse treatment, participating in counseling, and strengthening ties to family and friends. Home confinement provides similar opportunities, but is used for inmates BOP believes do not need the structure provided by RRCs. Inmates placed in home confinement are monitored and are required to remain at home when not working or participating in release programing and other approved activities.

Pursuant to the *Second Chance Act of 2007*, all federal inmates are eligible for RRC and home confinement placement. However, BOP's placement decisions are supposed to be driven by an individual assessment weighing an inmate's need for reentry services against the risk to the community. Inmates can be placed in RRCs for up to 12 months but can only spend a maximum of 6 months, or 10 percent of the term of imprisonment, whichever is shorter, in home confinement. In fiscal year 2015, the BOP spent $360 million on RRC and home confinement costs and, as of September 2016, BOP reported having 181 RRCs operated by 103 different contractors.

The Office of the Inspector General assessed BOP's RRC and home confinement programs, including its placement policy and practices, program capacity planning and management, and strategic planning and performance management. The audit covers inmates released from BOP custody from October 2013 through April 2016, either directly from BOP institutions, RRCs, or home confinement. Based on our analysis, we found that 94,252 inmates released from BOP custody during the scope of our audit were eligible for placement in an RRC and/or home confinement. BOP placed 79 percent of these eligible inmates into RRCs and/or home confinement - 75 percent were initially placed in RRCs and only 4 percent went directly into home confinement. The remaining 21 percent were released directly from a BOP institution.

Our audit found that BOP's RRC and home confinement placement policies and guidance, which are designed to identify individual inmate risks and needs

while simultaneously weighing these against the safety of the community and available resources, appear reasonable. In our judgment, the inmate's security level at the time of placement is the best indicator of inmate risk and need for transitional services because it incorporates key recidivism risk factors, as well the inmate's behavior during incarceration. As a result, we analyzed BOP's RRC and home confinement placement practices based on the exit security level of inmates released from BOP custody during the scope of our audit.

Our analysis determined that, contrary to BOP policy, BOP guidance, and relevant research, BOP's RRC and home confinement placement decisions are not based on inmate risk for recidivism or need for transitional services. Rather, we found that BOP is placing the great majority of eligible inmates into RRCs regardless of inmate risk for recidivism or need for transitional services, unless the inmate is deemed not suitable for such placement because the inmate poses a significant threat to the community. As a result, low-risk, low-need inmates are far more likely to be placed in RRCs than high-risk, high-need inmates. Specifically, we found that of the 94,252 inmates released between October 2013 and April 23, 2016, 90 percent of minimum security and 75 percent of low security inmates are placed in RRCs and/or home confinement. However, only 58 percent of high security level inmates were transitioned into the community through RRCs, while 42 percent were released into the community directly from a BOP institution.[1] We recognize this may be a result of the fact that many of the high security inmates were considered a public safety risk. Nonetheless, at the time they would be placed in an RRC, on average these inmates are within 4 months of being released into the community upon completion of their sentence. Thus BOP must weigh the immediate risk of placing high-risk inmates in RRCs against the risk of releasing them back into society directly from BOP institutions without transitional reentry programming.

It also appears that BOP is underutilizing direct home confinement placement as an alternative to RRC placement for transitioning low-risk, low-need inmates back into society. This underutilization of direct home confinement placement was evident when we reviewed data on placement of minimum and low security inmates and found that BOP placed only 6 percent of even those lower risk inmates directly into home confinement, despite BOP policy and guidance stating that direct home confinement placement is the preferred placement for low-risk, low-need inmates. This is particularly concerning given that BOP guidance, as well as the research cited in the guidance, indicates that low-risk inmates do not benefit from and may in fact be harmed by RRC placement because, among other things, of their exposure to high-risk offenders in those facilities. Moreover, the underutilization of direct home confinement for low-risk, low need inmates results in fewer RRC resources being available for high-risk, high-need inmates since the RRC inmate population is already at or in excess of BOP's contracted capacity. In addition, this

---

[1]  During the scope of our audit, 11 high security inmates were placed directly into home confinement.

practice may also further strain high security BOP institutions that are already well above capacity.

We found that, from October 2013 through March 2016, the RRC population has remained at about 101 percent of contracted capacity, while the home confinement population averaged nearly 159 percent of contracted monitoring capacity, despite BOP's apparent underutilization of it as an alternative to RRC placement.  The home confinement capacity issues resulted, at least in part, from BOP's policy to aggressively pursue transitioning inmates from RRCs to home confinement as soon as possible in an effort to increase RRC capacity.  This reduces the capacity for direct home confinement placements and, additionally, may result in inmates being transitioned from RRCs to home confinement too early, as evidenced by the fact that 17 percent of inmates were placed back into RRCs for violating home confinement program rules.

We also found that BOP lacks adequate performance measures to evaluate the success of its RRC and home confinement programming.  Although BOP has RRC and home confinement placement targets, these targets do not measure the effectiveness of RRC and home confinement programs.  Additionally, the placement targets – 85 percent from minimum, 75 percent from low, 70 percent from medium, and 65 percent from high security level institutions – appear to encourage institutions to maximize the number of inmates placed in RRCs or home confinement, regardless of transitional need.  In fact, the issues we identified with BOP's current placement practices may be driven, in part, by its RRC and home confinement placement targets.

The success of BOP's RRC and home confinement programs relies on the quality of programming provided by its RRC contractors, all of whom also provide services to and monitor inmates in home confinement.  However, we found that BOP's policy for monitoring its RRC contractors focuses on assessing compliance with the contractual Statements of Work, rather than assessing the quality of services provided by the RRC contractors.  Specifically, we did not identify any requirement that RRC contractors or BOP collect, retain, and report any statistics pertaining to RRC or home confinement program performance or success or failure rates.  If these measures were available, BOP could then incorporate these figures into its strategic planning, which might assist it in assessing its programs and RRC contractors based on measurable qualitative achievements as opposed to simply trying to meet numerical quotas.

Our report makes five recommendations to improve BOP's management of inmate placements in RRCs and home confinement.



Insert shipping
document here.

Do not ship liquids, blood or clinical specimens in this packaging.

Page 1 of 2

ORIGIN ID:ABEA        (860) 408-7000
GREEN CASTLE
GREEN CASTLE GROUP, INC.
PREFERRED
100 FIRST MILL ROAD

SHIP DATE: 26JUN17
ACTWGT: 1.00 LB
CAD: 5546959/NET3850

SIMSBURY, CT 06070
UNITED STATES US

BILL SENDER

TO   CLERK OF THE COURT
     US DISTRICT COURT
     MIDDLE DISTRICT OF PENNSYLVANIA
     235 N. WASHINGTON AVENUE
     SCRANTON PA 18501

(507) 207-5800        REF:
INV:                  DEPT
PO:

FedEx.

E

TUE - 27 JUN 3:00P
STANDARD OVERNIGHT

TRK#
9201    7794 9263 3871

18501
PA-US    ABE

EQ AVPA